JOSEPH P. McCORMICK, Administrator, Appellant, v. R. A. KENNEDY et al., Appellees.

No. 44153.

FEBRUARY 8, 1938.

REHEARING DENIED MAY 13, 1938.

William P. Welch and Geo. Allen, for appellant.

Prichard & Prichard and Kimball, Peterson, Smith & Peterson, for appellees.

984

SAGER, J.—Appellant presents one proposition for our consideration, which is thus stated in argument:

"The Court erred in sustaining the defendant's motion to withdraw from the consideration of the jury as a ground of actionable negligence paragraphs 17 and 17-A of the plaintiff's petition.

"Said grounds of actionable negligence so plead by the plaintiff being as follows:

" '(17) That the plaintiff's intestate, immediately before being struck by defendant's automobile had crossed over the paved portion of U. S. Highway No. 75 in a southwesterly direction and had reached a place of safety on the dirt shoulder lying immediately west thereof, and while in such place of safety the defendant, Kennedy, failed to continue his course on the paved slab as he approached the said John McCormick and drove out on the dirt shoulder and through the place of safety where the said John McCormick was walking.

" '(17-a) That under the circumstances stated in the foregoing ground No. 17, the defendants failed to give the said John McCormick any sufficient or timely warning of defendants' intention to change their course and to drive off the paved slab, and onto the shoulder and zone of safety where the said John McCormick was walking.' "

The question thus proposed calls for an examination of the record so far as it applies to this one feature of the case.

On the afternoon of June 11, 1935, McCormick was killed by an automobile driven by appellee Kennedy, a servant and employee of his corporate co-appellee. The deceased was a man 67 years old, weighing from 200 to 250 pounds, a farmhand, vigorous and alert for one of his years. The accident occurred within the limits of the town of Onawa, in Monona county. McCormick had been to this town with one Zortman and his wife. They had stopped at a filling station located on the west side of U. S. Highway No. 75, a main-traveled highway between Sioux City and Council Bluffs. Having purchased a quantity of gasoline, Zortman moved his car across the highway to make room at the gas pump for one Davis, whose car was parked along the north side of the filling station. Zortman brought his car to a stop on the east side of the highway, headed north, with his right wheels off the pavement. In that position he was about

112 feet north of the north line of the station. Davis, instead of stopping to take gas, drove across the highway to the east and stopped a short distance north and ahead of the Zortman car. At about this time appellee Kennedy came down from the north at a speed variously estimated at 50 to 65 miles an hour, and as he was about in front of the oil station struck McCormick with such force as to throw him a distance of 60 to 65 feet— ''like a bundle'' in a cloud of dust, as one or more of the witnesses described it. McCormick died in a very short time without being able to make, or at least without having made, any statement to those who hurried to his assistance. To go back a little in the record: McCormick was riding in the back seat of the Zortman car. As this car drove away from the filling station, Walker, the attendant, called that they should get their change, 14 cents. To get this money deceased stepped out of the east side of the car, went around behind it, and started in a diagonal direction southwest across the pavement. When he had reached the point to which reference will hereafter be made, he was struck by the car driven by Kennedy, as already stated. There were no cars in or about the station or along the highway other than those already mentioned, and no diverting circumstances, except that appellees claim the movement of the Davis car across the pavement obstructed Kennedy's vision and he was thereby excused from failure to avoid the injury and death of McCormick. Appellees make much of the fact that, the highway being straight for a long distance north (the direction from which Kennedy came), McCormick would have seen the approaching car had he looked. This, if it proves anything, proves too much. If the vision was unobstructed for the deceased, it was likewise unobstructed for Kennedy had he been using his eyes to see what was ahead of him as he approached this filling station.

The record in the case is very long and no attempt will be made to examine it at length, nor do we find it necessary to do so. We are concerned only with the question as to whether the specification of error upon which appellant relies finds support or not. To this we direct our attention.

The witness Heinse, who worked about the filling station, had her attention attracted to what she thought was the sound of automobile brakes at the time the accident occurred. She did not see the actual collision, but turning saw ''something coming

through the air like a bundle. It must have been 15 or 20 feet that I saw it coming through the air. I saw it come to rest. After it stopped I saw that it was Mr. McCormick. I went over to where he was lying. He was lying on the right side of the pavement clear to the edge with one foot out on the shoulder. The right side of the pavement would be the west side, right as you go south.'' This witness, when asked about where there were any wheel marks to the west of the paving slab, answered that the wheel tracks were about 30 inches west of the slab and extended quite a way north, and that this mark on the shoulder was parallel with the burned mark she noticed on the pavement. On cross-examination this witness elaborated somewhat by saying that the marks 30 inches from the pavement were quite close to the north side of the station.

Walker, the appellant's only eyewitness to the actual collision, noticed McCormick as he left the Zortman car to come toward the filling station. At that time he saw a car at quite a distance north, and again as the deceased walked across the pavement. As he noticed the car the second time it was coming from the north along the edge of the pavement. He observed its movements practically continuously for a couple of hundred feet before it struck McCormick. He says that the brakes were applied intermittently for about 125 feet, and that after the accident he noticed marks on the pavement made by the tires. These marks were not on the pavement before the accident. No other vehicles had passed, so the inference was not only permissible but perhaps unavoidable that they were caused by the car appellee Kennedy was driving. This witness estimated the distance from the farthermost mark on the south to the farthermost mark to the north at 125 feet. At the same time the car that struck McCormick made a mark on the shoulder west of the slab a distance of about half the width of the tread of the tires. Other witnesses examined the marks to which this witness refers. Walker, when asked whether the automobile that killed McCormick sounded a horn, answered, ''I think not.''

After the accident the car turned almost its own length and stopped about the middle of the pavement, headed northeast. The front of the radiator was broken, as was the right lamp. The west side of the grillwork in the front of the radiator was caved in, all of which indicated that the right side of the car

came in contact with the deceased. This, from the witness Walker, vividly describes the contact:

"After the car struck McCormick, I noticed the direction that his body took. It just went right straight down the edge of the paving, just as straight as a person could throw a ball. I know the distance that he went down that pavement before he stopped from the time the car hit him. It was between 60 and 65 feet."

Elaborating somewhat on his statement about the mark made by the right wheels of the car off the pavement, Walker said that he followed this mark back to the place where it left the pavement and found it to have been a distance of about 30 feet from where McCormick was struck. From the testimony of this witness, it appears that McCormick at the time he was killed was as much off the paving slab as he was on it. Walker said: "It looked very much from where I was he was just taking his last step off the pavement." This witness on cross-examination emphasized this testimony by saying that the deceased was on the very west edge of the pavement, with one foot on the pavement, as he was struck, indicating from his testimony generally that after the fleeting instant it would have taken to lift his right foot off the paving he would have been fully on the shoulder when Kennedy hit him.

The witness Patterson, who lived in one of the cabins located on the filling station ground, had his attention attracted by the "squeal" of brakes, and turning saw what "looked more or less like a bundle" going through the air. He followed it and continued to look at it until it came to rest. He continues: "I then went over to it. It was John McCormick." This witness, too, noticed the marks on the shoulder west and opposite those burned marks on the pavement at or near the point of collision. These marks at the farthermost distance from the paving slab were about 30 inches off on the shoulder. He traced the marks on the shoulder backward to the point where they joined the pavement, estimating the distance at about 90 feet. He says that where McCormick lay when he died, "he was lying face upward, his head to the north, and one leg was off the slab."

The wife of the last-named witness corroborated in vivid language the testimony of her husband, and when asked whether there was any dust or anything that interfered with her vision,

answered: ''Only when I saw the cloud of dust and thought that was a bundle I saw sliding down the road.''

Mrs. Zortman, who looked when her attention was attracted by the setting of brakes, did not see the accident at the instant that it occurred, but saw McCormick in a movement that looked to her as if he were ''making a jump'', the inference being, of course, that he sought to escape the oncoming car.

Much other testimony descriptive of the circumstances and the surroundings would warrant the jury in finding that at the time McCormick was struck he was more off the pavement than on it. All of his body that remained on the pavement was his right heel, and at the time the right wheels of the car driven by Kennedy were a considerable distance off the shoulder. This, in connection with the fact, as the jury might have found, that there was nothing to indicate that Kennedy had any excuse for being where he was at the time he killed McCormick other than his explanation with reference to the Davis car, seems not only to justify but to require the submission of the grounds of negligence pleaded by appellant under designation 17 and 17-a already set out.

While not adopting literally and in all its terms as a rule of law in this state the following, it comprehends in brief so many of the considerations applicable to this and similar cases that we quote:

''The driver of an automobile is bound to anticipate the presence of pedestrians upon the streets of a city or upon rural highways, as well as to exercise reasonable care that he does not injure them after he is aware of their presence. O'Dowd v. Newnham, 13 Ga. App. 220, 80 S. E. 36. The court said: 'The application of this principle is qualified by the rule to which we have just referred in the first division of this opinion. The pedestrian, like the driver of an automobile, in the exercise of ordinary care for his own safety and for the safety of others, is required to anticipate the presence of persons and vehicles upon the highway. But it cannot be said that the duty which is upon the pedestrian is as urgent as that devolving upon the driver of an automobile, for the foot passenger's action or inaction in the premises is far less important to the other users of the highway. The impact of the body of a pedestrian absorbed in his own meditations, upon a passer-by, might be measurably uncomfortable,

but it would seldom be hazardous to either life or limb; whereas the impact of an automobile in motion while the driver is asleep might cause as certain death as if the injured person had been wilfully pursued and wantonly crushed. The pedestrian and the automobile have equal rights upon the highway, but their capacity for inflicting injury is vastly disproportioned. It follows, also, from this, that the driver of an automobile cannot be said to be using the highway within his rights, or to be in the exercise of due care, if he takes advantage of the force, weight, and power of his machine as a means of compelling pedestrians to yield to his machine superior rights upon the public highway, designed for the use of all members of the public upon equal terms. Instances are almost a matter of daily occurrence where apparently the drivers of automobiles operate their machines as if they have been granted a right of way over the public highways, and as if it is nothing more than the duty of the pedestrian to yield precedence to the automobile and to stop and wait until the automobile has passed before attempting to proceed in crossing a street or otherwise using the highway. If there is anything in the argument of priority, man was created before the automobile, and, to paraphrase a quotation from Holy Writ, man was not created for the automobile, but the automobile was created for man. Generally, the natural instinct of self-preservation will inspire in the pedestrian a due degree of caution for his own safety, when he is aware of the approach of an automobile, and this the law will require him to exercise. Sometimes the circumstances surrounding the approach of one of these vehicles of ponderous proportions inspire a terror which paralyzes the power of locomotion on the part of the traveler on foot, especially if he be a child of tender years. In such a case, the dangerous character of the instrumentality which the driver of an automobile is operating forbids the assertion that he has exercised even ordinary diligence, unless he has used every possible means to avoid injury to the pedestrian. On account of the ease with which injury can result from the slightest negligence or inattention in the operation of his machine, ordinary diligence requires that the driver of an automobile be constantly on the lookout, and that he have his machine in such condition as that it shall be under his perfect control. The pedestrian also is required to be on the lookout; but he has the right to assume that the drivers of all automobiles are on the lookout for

990

him too, and if he is properly upon the public highway, which he is entitled to use equally with them, he has the right to assume that they are both willing and able to regard his rights. While, therefore, the law requires that a pedestrian and the driver of an automobile shall each anticipate the presence of the other upon the public highways, and that neither shall do any act likely to jeopardize the safety of the other, still, on account of the great disparity in their respective capacities to inflict injury, the exercise of ordinary diligence on the part of the pedestrian to look out for automobiles does not necessarily require as continuous caution as is requisite to enable an automobilist to fulfill the definition 'ordinary diligence' as applied to one having in his charge a dangerous and death-dealing instrumentality.' "
Note to Deputy v. Kimmell, 51 L. R. A. (N. S.) 989 at p. 990.

The reflections induced by this quotation, and other authorities which might be cited, may account for, and perhaps justify, the conclusion hereafter announced.

We have purposely refrained from discussing the testimony offered by appellees because we are not concerned with what the result might have been had the case been submitted to the jury with the specification of negligence for the omission of which appellant appealed. On the whole record we are satisfied that appellant's complaint is justified, and that because of the error complained of the case should be, and it is reversed.—Reversed.

STIGER, C. J., and HAMILTON, ANDERSON, KINTZINGER, DONEGAN, MITCHELL, and MILLER, JJ., concur.